# IN THE SUPREME COURT, STATE OF WYOMING

## 2021 WY 35

*October Term, A.D. 2020*

*February 24, 2021*

BOARD OF PROFESSIONAL
RESPONSIBILITY, WYOMING
STATE BAR,

Petitioner,

v.

DANIELLE M. MATHEY, WSB
#7-4956,

Respondent.

D-21-0001

## ORDER OF DISBARMENT

[¶ 1]     **This matter** came before the Court upon the Board of Professional Responsibility's "Report and Recommendation for Disbarment," filed herein February 9, 2021, pursuant to Rule 12 of the Wyoming Rules of Disciplinary Procedure (stipulated discipline). The Court, after a careful review of the Report and Recommendation and the file, finds that the Report and Recommendation should be approved, confirmed and adopted by the Court, and that Respondent Danielle M. Mathey should be disbarred. It is, therefore,

[¶ 2]     **ADJUDGED AND ORDERED** that the Board of Professional Responsibility's "Report and Recommendation for Disbarment," which is attached hereto and incorporated herein, shall be, and the same hereby is, approved, confirmed, and adopted by this Court; and it is further

[¶ 3]     **ADJUDGED AND ORDERED** that, as a result of the conduct set forth in the "Report and Recommendation for Disbarment," Respondent Danielle M. Mathey shall be, and hereby is, disbarred, effective immediately; and it is further

[¶ 4]     **ORDERED** that Respondent shall comply with the requirements of the Wyoming Rules of Disciplinary Procedure, particularly the requirements found in Rule 21 of those rules. That rule governs the duties of disbarred and suspended attorneys; and it is further

[¶ 5]  **ORDERED** that, pursuant to Rule 25 of the Wyoming Rules of Disciplinary Procedure, Respondent shall pay the Wyoming State Bar the amount of $100.00, which represents the costs incurred in handling this matter, as well as pay administrative fees of $1,500.00.  Respondent shall pay the total amount of $1,600.00 to the Wyoming State Bar on or before April 30, 2021.  If Respondent fails to make payment in the time allotted, execution may issue on the award; and it is further

[¶ 6]  **ORDERED** that the Wyoming State Bar may issue the stipulated press release contained in the "Report and Recommendation for Disbarment"; and it is further

[¶ 7]  **ORDERED** that the Clerk of this Court shall docket this Order of Disbarment, along with the incorporated "Report and Recommendation for Disbarment," as a matter coming regularly before this Court as a public record; and it is further

[¶ 8]  **ORDERED** that, pursuant to Rule 9(b) of the Wyoming Rules of Disciplinary Procedure, this Order of Disbarment, along with the incorporated "Report and Recommendation for Disbarment," shall be published in the Wyoming Reporter and the Pacific Reporter; and it is further

[¶ 9]  **ORDERED** that the Clerk of this Court cause a copy of this Order of Disbarment to be served upon Respondent Danielle M. Mathey.

[¶ 10]  **DATED** this 24th day of February, 2021.

BY THE COURT:

/s/

**MICHAEL K. DAVIS**
**Chief Justice**

BEFORE THE SUPREME COURT
STATE OF WYOMING

IN THE SUPREME COURT
STATE OF WYOMING
FILED

FEB - 9 2021

SHAWNA GOETZ, CLERK
by CHIEF DEPUTY

In the matter of                )
DANIELLE M. MATHEY,             )
WSB # 7-4956,                   )
                                )   *WSB Nos. 2018-002 and 2020-029*
    Respondent.                 )
                                )   D-21-0001

## REPORT AND RECOMMENDATION FOR DISBARMENT

THIS MATTER came before a Review Panel of the Board of Professional Responsibility via telephone conference call on the 2nd day of February, 2021, for consideration of the parties' Stipulation for Disbarment pursuant to Rules 9 and 12 of the Wyoming Rules of Disciplinary Procedure. Present on the call were Review Panel members Debra J. Wendtland (Chair), Katherine Strike, and Tandy Dockery. Melinda S. McCorkle, Deputy Bar Counsel, appeared on behalf of the Wyoming State Bar. Respondent Danielle M. Mathey appeared with her counsel, Elizabeth Greenwood. The Review Panel having reviewed the Stipulation, the supporting Affidavit, and victim impact letters from both Complainants, and being fully advised in the premises, finds, concludes and recommends:

### Findings

1. Respondent was first admitted to practice law in New York in 2006. She was admitted in Nevada in 2010 and in Wyoming in 2012. Respondent practiced law in Green River from 2012 until 2020. On May 14, 2020, Respondent changed her status with the Wyoming State Bar from "active" to "inactive." On July 27, 2020, Respondent voluntarily withdrew her membership in the Wyoming State Bar. Respondent acknowledges that though her bar membership has been withdrawn, she remains subject to discipline pursuant to the Rules of Disciplinary Procedure.

2.      On March 14, 2016, Lyman residents Jack and Marianne Bluemel hired Respondent to file a lawsuit on behalf of their company, JAMA Enterprises, LLC, against RPM Elite, Inc., et. al. ("RPM suit") seeking damages in the amount of $39,075.27 for breach of contract.

3.      On March 14, 2016, Ms. Bluemel emailed Respondent with information to pursue the case against RPM. On May 10, 2016, Ms. Bluemel emailed Respondent with a new place of employment for one of the defendants in the RPM suit. Respondent responded, "Thank you Marianne. Things are moving along, but this will help immensely."

4.      On September 26, 2016, Ms. Bluemel emailed Respondent requesting a status update on her cases as she had not heard from Respondent in four months. On November 5, 2016, Respondent responded to her email, stating:

Hello Marianne,

I deeply apologize that it has taken so long to respond to your email. For some reason, it got misdirected to my spam and was not discovered until today, when I came to work to clean out my email mailbox.

Your cases are proceeding well. The biggest delay was getting a judge who did not share your last name. Now I am waiting for your debtors to send me the evidence they have, something they are required to do under the rules of procedure. After that, I intend to move for judgment because the documentation you sent me last spring is sufficient to finish the case. At that point, I will need an affidavit from you to authenticate the evidence. How would you like to handle that? Do you want to come to my office? I will probably file the motion in early December.

5.      On February 20, 2017, Respondent told Ms. Bluemel Respondent would "get on" the case, that there were no questions of fact for the judge, that the Bluemels' affidavits would be authenticated and submitted to the judge, and then they would wait for the court to act.

2

6.     On April 5, 2017, Ms. Bluemel requested a status update on the RPM suit. Between April 2017 and February 28, 2018, Respondent did not call, email or otherwise communicate with Ms. Bluemel regarding the case despite calls and emails from her.

7.     On January 16, 2018, the Bluemels filed a complaint against Respondent with the Office of Bar Counsel ("OBC"). On January 18, 2018, Bar Counsel sent the Bluemels' complaint to Respondent and requested a response by February 10, 2018.

8.     On February 13, 2018, Respondent responded to Bar Counsel, stating that she thought she was managing her workload until the complaint was filed:

> Receipt of the Bluemels' complaint proved me wrong. It was an eye-opener in many ways. First, the fact that the complaint was even made is evidence that my mental health issues have caused me to allow a client to slip through the cracks. Of greater concern to me was the extremity of my reaction. It was deeply irrational and forced me to acknowledge that I cannot get the help I need in Sweetwater County. Despite my best efforts, I have violated my duty of diligence and my duty to communicate, a fact which I deeply regret. Because I have violated those duties, I do not deserve to defend myself against the Bleumels' [sic] complaint and I will not defend myself. Instead, I seek to offer a proposition.

> My proposal is based on the hope that the Wyoming Bar believes in rehabilitation where possible. When I am stable, I am a good lawyer. If I cannot become stable, I should not be practicing law. Therefore, I suggest the following: private reprimand, contingent upon me successfully completing a course of treatment for depression and anxiety. The Bar, of course, can set the standards for that success, and can set the consequences for any potential failure. Given the truths that have become apparent in the last few weeks, I must concede that inpatient treatment is both necessary and appropriate. Reparations are also due to the Bluemels, and they should receive what they requested in their complaint. I will refund any amounts that they have paid my office, with my apologies, and will diligently complete their cases, without charge.

9.     Upon receipt of Respondent's response to the Bluemel complaint, Bar Counsel put the investigation on hold based upon Respondent's assurance that she would "diligently complete their cases, without charge."

10.    On February 28, 2018, Respondent informed Ms. Bluemel that Respondent was "filing" something with the Court "today or tomorrow."

3

11. On April 16, 2018, Respondent told Ms. Bluemel that Respondent needed affidavits from the Bluemels, which they signed on April 26, 2018. Respondent spoke with Ms. Bluemel again on April 23, 2018, stating that Respondent would mail a new affidavit to the court and explaining that once an order is entered, a garnishment can be sent to the employers and payment would then be made to the clerk of court. Respondent told Ms. Bluemel that it took four years for the judge to sign an Order in a different case.

12. On May 24, 2018, Shannon Howshar, Assistant to Bar Counsel, called Respondent regarding the status of the Bluemel case. Respondent stated that she was in regular contact with Ms. Bluemel and that a judgment in the Bluemels' favor should be entered soon. Respondent agreed to provide the OBC with a copy of the judgment once it was entered.

13. On October 11, 2018, Ms. Bluemel emailed Respondent asking whether Respondent had "heard anything from the court or judge." The subject line stated "RPM suit."

14. On October 15, 2018 and October 24, 2018, Ms. Howshar emailed Respondent requesting updates and a copy of the judgment if entered. Respondent did not respond to either inquiry.

15. On October 24, 2018, Respondent responded to Ms. Bluemel's October 11 email as follows:

Hello Marianne,

I apologize for taking so long to get back to you. Last week was ... well, I was out of town for the beginning of it, and then my college roommate lost her son on his 14th birthday. And then I was out of town again earlier this week, because I just can't seem to have court in Green River anymore.

I was in Evanston in [sic] Monday on another matter and reminded the judge of your pending motion. He asked about your intention for garnishment and whether their employment had changed?

In response, Ms. Bluemel provided Respondent with updated employment information for one of the defendants.

4

16.     On October 30, 2018, Ms. Howshar again requested an update via email. On November 2, 2018, Respondent responded as follows:

Shannon,

I apologize. The last few weeks have been ... well, Murphy's Law was in full effect. Lots of funerals (the worst was my college roommate's son, who passed on his 14th birthday), lots of emergencies, lots of travel, very little time in the office.

This case is not finished yet, but I remain hopeful that we are about done. I was a little overoptimistic before because of an unknown issue related to damages. There was a data entry error in the spreadsheet I was provided about damages that created a $10,000 discrepancy between what we were asking for and what the actual damages turned out to be. It took a while to work out. In the meantime, Marianne and I have been in contact and are making plans for collection when the suit ends. She just sent me updated employment information for garnishments on Monday.

17.     In December 2018, Respondent told Ms. Bluemel that the judge signed the garnishment order but there was an eight-week backlog.

18.     On January 10, 2019, Ms. Howshar emailed Respondent requesting a status update. Respondent did not respond.

19.     On March 24, 2019, Bar Counsel emailed Respondent requesting a status update since Respondent had not responded to Ms. Howshar's request. On March 25, 2019, Respondent responded, stating:

I'm afraid I didn't see the email from Shannon. I apologize. It could be that I accidentally deleted it when deleting a lot of other junk mail from my phone-I was mediating in Cheyenne on January 10, and so wasn't using my usual Outlook on a desktop to go through correspondence.

The Boyles have filed for divorce and are selling off their assets. Since it appears their companies were entirely plundered, Marianne [Bluemel] has asked me to pierce the corporate veil and collect against them personally (specifically against their house, which rumor has it is going to be put on the market in April or May). I'm following the guidance from the Red Desert Reclamation case (which I lost and so remember well) to pierce the corporate veil so that they can collect. I can't wait for this one to end. Piercing the corporate veil is no fun, especially against parties that choose to appear pro se. Marianne, however, has been a fount of information. It helps that Jeanette Boyles is her niece.

5

20. In 2019, Respondent had one conversation with Ms. Bluemel.

21. On January 14, 2020, Bar Counsel requested a status update, stating, "The Bluemel complaint is now two years old. We have heard nothing from you since March 2019. Please provide an update as soon as possible." Bar Counsel sent another email on January 17, 2020.

22. In January 2020, Ms. Bluemel again contacted Respondent's office regarding the garnishment and checks since she had not received any money from the court. Initially, Respondent's staff could not locate the RPM file. On February 5, 2020, Respondent's office informed Ms. Bluemel that it would contact the court regarding the garnishment checks. Respondent later told Ms. Bluemel that her office needed to send another garnishment to the court and that it could take up to ninety (90) days to begin receiving checks.

23. On March 6, 2020, Deputy Bar Counsel sent Respondent an email requesting: (1) a status update on the Bluemel matter; (2) whether Respondent refunded the Bluemels the fee they paid to Mathey Law Office as she had promised in her February 13, 2018 letter to the OBC; (3) whether Respondent continued to represent the Bluemels without charge; and (4) written confirmation of Respondent's withdrawal from the RPM suit.

On March 13, 2020, Respondent responded to Deputy Bar Counsel's inquiry as follows:

The Bluemels have been refunded and Mathey Law Office has retained no monies from them. Maryanne and I have been speaking regularly as we both attempt to find Jeanette. My firm is in the process of switching from Westlaw to Lexis and our new plan includes PeopleFind, so we are hopeful that it will be helpful.

This case is being transferred to [another attorney in Respondent's office].

24. On March 20, 2020, Respondent reiterated that the case has been transferred to another attorney in her office.

25. On March 20, 2020, Deputy Bar Counsel requested a copy of the Substitution of Counsel. On March 23, 2020, Respondent provided the OBC with a Notice of Withdrawal and

6

the Entry of Appearance for [another attorney in Respondent's office], dated March 18, 2020 and March 23, 2020. The Entry of Appearance did not have a Certificate of Service. The Notice of Withdrawal contained a Certificate of Service signed by Respondent stating that copies of the Notice were served on the opposing parties on March 18, 2020. Neither document contained a civil action number, docket number or other identifying information. Neither document was file-stamped by the clerk of court. The documents were falsifications, fabricated by Respondent in response to Deputy Bar Counsel's request.

26. Contrary to what Respondent had been telling Ms. Bluemel for more than three years, and contrary to numerous representations to OBC, the RPM suit was not filed until April 1, 2020. Everything Respondent had told Ms. Bluemel and OBC about the status of the case was a fabrication on Respondent's part.

27. Deputy Bar Counsel requested Respondent's entire case file for the Bluemel matter no later than May 1, 2020. On May 1, 2020 at 6:49 p.m., Respondent responded via email, stating:

> I am writing to let you know that I'm not ignoring the May 1 deadline and still hope to meet it. I've been out a lot in the last two weeks, especially as the family cancer scare transitioned into a "Good news, it's just a brain tumor" situation. I already know most of the doctors who are needed because of my own adventures in otosclerosis and so I've been needed to assist with that situation. I made a point of getting back today in time to send you the file, only to find that the internet is down. As soon as it is up, I have an email prepared. Sadly, I cannot send it from my cell.

28. On May 4, 2020, Respondent emailed the Bluemel file, including a Summons to the RPM defendants and a Motion for Summary Judgment in the RPM suit. Neither of these documents was dated, signed, or file stamped, nor did they contain a case number. The documents were falsifications, fabricated by Respondent in response to Deputy Bar Counsel's request.

7

29. On May 4, 2020, Deputy Bar Counsel asked for confirmation that the documents attached to Respondent's May 4 email constituted the entire Bluemel case file. In response, Respondent stated that she had file stamped versions of the Complaint and Summons, did not have an alias Summons because she had not located the individual defendants, and that she could not find scanned versions of the affidavits signed by the Bluemels.

30. On May 7, 2020, Deputy Bar Counsel reiterated the request for the entire file, including invoices, by May 11, 2020.

31. On May 7, 2020, Respondent informed the OBC that she intended to seek inactive status, transfer ownership of Mathey Law Office to Respondent's partner, take a leave of absence of at least 120 days, and may return her license to practice law in Wyoming.

32. Deputy Bar Counsel reiterated the May 11 deadline.

33. On May 11, 2020, Respondent provided additional documents, including an invoice for the Bluemels, which indicated that zero hours had been spent on the case and that the client and matter had not been created in QuickBooks because an invoice had not been sent. Respondent added a handwritten note stating: "Doesn't exist in [QuickBooks] because nothing has been billed." Respondent also provided file stamped copies of the Summons and Complaint in the RPM case, which were file stamped April 1, 2020.

34. On May 14, 2020, Respondent changed her status with the Wyoming State Bar from "active" to "inactive."

35. With respect to the Bluemels' complaint, there is clear and convincing evidence that Respondent committed the following professional misconduct:

    a. Respondent violated Rule 1.3 (diligence) by delaying filing the Bluemels' lawsuit, JAMA Enterprises v. RPM Elite, for over four years.

8

b.      The same conduct also constitutes a violation of Rule 3.2, which provides, "A lawyer shall make reasonable efforts to expedite litigation consistent with the interests of the client."

c.      Respondent violated Rule 1.4 (communication with client) by (1) failing to respond timely, or at all, to the Bluemels' inquiries about the RPM lawsuit and (2) making material misrepresentations to the Bluemels about the status of the RPM case, including asserting that the RPM lawsuit had been filed and was progressing but delayed for reasons beyond Respondent's control.

d.      Respondent violated Rule 8.1 (duty to cooperate with disciplinary investigation) by (1) failing to provide documents requested by the OBC and failing to respond to requests altogether, and (2) knowingly and repeatedly making material misrepresentations to the OBC.

e.      Respondent violated Rule 8.4(c) (dishonest conduct) by repeatedly lying to the Bluemels about the status of their case.

f.      Respondent violated Rule 8.4(d) (conduct prejudicial to the administration of justice) by blaming judges, court staff and the court system for delays in the RPM lawsuit when in fact the delay was caused by Respondent's failure to file the case.

Investigation No. 2020-029 – Steven Johnson, Complainant

36.     Steven Johnson was a client whom Respondent represented in various matters. On April 21, 2020, Johnson filed a complaint against Respondent with the OBC regarding Respondent's representation of him in Best Value Rentals v. Tabler. Respondent also represented Johnson on two other matters that became the subject of an investigation: (1) Noble Investments v. City of Rock Springs, and (2) litigation against a company in Idaho (the "Idaho litigation").

9

37. Johnson hired Respondent to represent his company, Noble Investments, in a lawsuit against the City of Rock Springs stemming from property damage caused by a sewer backup in 2016. Respondent billed Johnson for conversations with the attorney for the City of Rock Springs, Richard Beckwith, on June 7, 2017, November 15, 2018, and November 29, 2018.

38. Respondent also represented Johnson and another individual (hereinafter "Co-Plaintiff") in the Idaho litigation. The Idaho litigation was mediated in May 2018, resulting in a $47,500.00 settlement, the proceeds of which were deposited into Respondent's trust account on June 17, 2019.

39. Johnson and Co-Plaintiff made multiple inquiries asking when they would receive their funds. Respondent told them she was not able to distribute the funds until Respondent received a final invoice her co-counsel in Idaho ("Idaho co-counsel").

40. On July 26, 2019, Johnson emailed Respondent asking if she could send her invoice and Johnson's and Co-Plaintiff's settlement checks pending communication from Pendlebury or verbally obtain the amount owed so that checks could be issued. Respondent did not respond to this request.

41. On July 31, 2019, Johnson requested copies of all documents and filings in the Noble Investments lawsuit against the City of Rock Springs so that he could transfer the case to another attorney.

42. In mid-August, Johnson contacted Idaho co-counsel's office and was informed that the final invoice was paid by Respondent's office in June 2019.

43. On August 16, 2019, Johnson sent a certified letter (the "8-16-19 Letter") to Respondent detailing his concerns about the failure to receive settlement proceeds and informing Respondent that no money was owed to Idaho co-counsel. Johnson also complained that his messages and emails had not been returned in the preceding three weeks, that he was not getting

read receipts from his emails, and he believed his texts had been blocked. In the same letter, Johnson sought information about the lawsuit against the City of Rock Springs:

> Finally, it has been a long time I received any update from you on the case we filed against the City of Rock Springs for flooding my shop with raw sewage back in 2016. I know when we spoke in March nothing had changed since the complaint was sent to the judge to sign off on a Summary Judgement, which was over 2 years ago if I recall correctly. I never received copies of any documents, filings, pleadings, etc... on this case. Please prepare copies of all filings and pleadings along with a summary of what has been done to date and current status of the case and forward them to me.

44.     Respondent responded on August 26, 2019 as follows:

Steve:

I have received the letter you mailed me. Thanks for the mail; if you had previously sent emails, I had not received any since the one I sent you at the end of July. We updated our security again after catching a hacking attempt, and even though your email is marked as "safe" I am told it got caught up in the updated security. The "FlashFunding" part is what gets flagged. I have asked numerous times for that to be fixed, but apparently it correlates too closely to known problem email addresses for an algorithm.

I am still asking [Idaho co-counsel] for his billing. I have received no responses. If it is acceptable to you, I will hold back $1000 from the final payments to you and Andy so that I can finalize everything else. Then, when Drew sends his bill, I can pay him and send out the remainder. Alternatively, I can forward his final bill to you for direct payment.

In the same email, Respondent promised that she was "gathering the documents for the Rock Springs lawsuit," which would be mailed "early next week." The documents were not mailed.

45.     Johnson immediately responded, reiterating that he had spoken with two individuals at Idaho co-counsel's office who confirmed that there are no outstanding invoices, forwarded an email from the office which contained a detailed list of payments from Respondent's office, and stated he was looking forward to receiving the settlement check.

46.     Respondent's assistant responded to Johnson's email by stating that she "took it as far as I could go without having Danielle's time, she has to do that." Respondent's hourly fees for the Idaho litigation were to be deducted from the settlement proceeds.

11

47. On September 12, 2019, Respondent sent Johnson an email stating that she had received an Order for the Default Judgment for the Noble Investments property damage claim against the City of Rock Springs ("Default Judgment"):

> The good news is that, what with judicial retirements, orders are getting signed. We finally got your judgment for Rock Springs yesterday. You get the $7,545.66 that we claimed, but it's a tort and a governmental entity, so only post-judgment interest. I should get the check from Gladfelter's by the end of the month. I'm not complaining. If they had actually opposed the complaint, you would have had more legal fees plus they would have whittled down those damages.
>
> The news is that checks are going out today. I had to wait because Barb was on vacation and it turns out that no one else knew how to issue them, but she's back now. If it is preferable to you, I can deduct the $7,545.66 from the judgment against Rock Springs we're expecting payment on and then finish everything up with one check to you. That will place the risk of collecting on my office, but since it's an insurance company I'm willing to assume the risk.

48. Respondent's statement that a Default Judgement had been obtained against the City of Rock Springs, as well as her statement that the Idaho litigation settlement checks were being mailed that day, were falsehoods.

49. On September 20, 2019, Co-Plaintiff sent Respondent an email threatening to notify the OBC if the Idaho litigation settlement checks were not received by the following week. A few hours later after receiving Co-Plaintiff's email, Respondent responded as follows:

> When you called yesterday and said you feared [the settlement checks] had been lost, rather than delay further (because I know Green River mail can take up to 2 weeks even locally), I figured we should cancel the checks and send new ones. So, 10306 and 10307 have been cancelled and 10310 and 10311 have been issued. To be triple sure they get to you, your tracking numbers are 7016 0910 0000 0433 and 7016 9010 0000 9630 0440.

Respondent's statements were falsehoods. Respondent did not issue or send checks to Johnson or Co-Plaintiff prior to receiving Co-Plaintiff's email threatening to contact the OBC. Check #10306 was written to the U.S. Treasury on July 29, 2019. Check #10307 was written on behalf of another client on September 13, 2019. There were no voided checks written to Johnson or Co-Plaintiff.

12

50. On September 20, 2020, Respondent issued checks to Johnson and Co-Plaintiff in the amounts of $26,350.69 and $7,432.24, respectively. Respondent enclosed a final invoice for her fees in the Idaho litigation in the amount of $13,717.07, which Respondent deducted from the $47,500.00 gross settlement amount before distributing the balance, $33,782.93, to Johnson and Co-Plaintiff. The invoice Respondent provided to Johnson was dated September 20, 2019 and contained eighteen (18) months of time entries. The invoice stated that the balance remaining in the trust account after payment of the $13,717.07 invoice for Respondent's fees was $33,782.93.

51. On September 24, 2020, Johnson sent Respondent an email questioning the amount withheld from the settlement for Respondent's fees based upon his understanding that Respondent's total fees for the case were approximately $14,000.00 but he had already paid $7,000.00. He also requested a copy of the Default Judgment against the City of Rock Springs.

52. On September 30, 2020, Respondent responded to Johnson's email: "My recollection of our conversation in Utah was that I told you that the bill was around $14,000 outstanding—that the initial [$7,000] deposit was gone, and that the remainder was going to be around $14,000." Regarding the Default Judgment against the City of Rock Springs, Respondent wrote:

> The check for the other case arrived and cleared. I believe it has been mailed but will have to confirm that with Barb. It's hard to miss checks for thousands of dollars when they're presented to me for signature, so I know it has been signed. As suspected, the insurance company paid promptly. Given their silence and the existence of a default, I suspect they never told Rock Springs that suit was filed. Better to quietly pay and make it go away after that kind of error.

Respondent attached to the email a fabricated Default Judgment against the City of Rock Springs. The fabricated Default Judgment indicated that the case had been filed in the District Court for the Third Judicial District. The case number was partially obscured and unreadable. The document appeared to have been file-stamped September 9, 2019 and signed by Judge

13

James. When Respondent fabricated the Default Judgment, she photocopied Judge James' signature and the District Court file stamp from a different case and taped them to the fabricated Default Judgment. In truth, no action was filed against the City of Rock Springs.

53. On September 30, 2019, Respondent wrote Johnson a check for $7,545.66 – the amount of the fabricated Default Judgment against the City of Rock Springs – from Respondent's trust account. Though Respondent represented to Johnson that these were funds received from the City of Rock Springs' insurance company, in truth, these funds were part of the $47,500.00 settlement received in the Idaho litigation. Respondent paid herself only a portion ($6,171.41) of the amount Respondent told Johnson she deducted from the Idaho litigation settlement ($13,717.07) in order to leave sufficient funds in the trust account ($7,545.66) to pay the fabricated Default Judgment.

54. In December 2018, Johnson asked Respondent to file a Forcible Entry and Detainer action against Nick and Stephanie Tabler, former tenants of Johnson's. Mr. Tabler was not served. Ms. Tabler was served but did not appear, so judgment was entered against her.

55. In January 2019, Johnson asked Respondent to commence a civil suit against Mr. Tabler in Circuit Court. Respondent agreed to begin working on the case immediately.

56. Respondent led Johnson to believe that she had commenced a civil suit against Mr. Tabler. When Johnson expressed frustration with the lack of progress on the case in January 2020, Respondent told him the delay was due to "chaos" at the Circuit Court. In truth, Respondent never filed an action against Mr. Tabler, in Circuit Court or anywhere else.

57. When Deputy Bar Counsel provided Respondent with a copy of Johnson's complaint against her in April 2020, Deputy Bar Counsel requested that Respondent respond in writing by May 1, 2020. Respondent did not respond.

14

58. On May 7, 2020, Deputy Bar Counsel requested Respondent's trust account records from January 1, 2019 to the present. On May 11, 2020, Respondent produced a document entitled "Trust Printout," stating, "I don't know whether the trust account information is what you want; it's the report that prints when the dates you mentioned are input." The Trust Printout was generated by MyLeanLaw and identifies clients and account balances.

59. On May 11, 2020, Deputy Bar Counsel reiterated that the trust account records sought "are the records kept pursuant to Wyoming Rule of Professional Conduct 1.15(g)" and needed to be received by May 14, 2020. In response, Respondent again provided documents detailing transactions and balances for individual clients but did not provide bank statements.

60. On May 14, 2020, Respondent changed her status with the Wyoming State Bar from "active" to "inactive."

61. On June 30, 2020, Deputy Bar Counsel instructed Respondent to "provide monthly statements from June 2019-October 2019 for the Mathey Law Office Wyoming State Bar Foundation IOLTA Account at the Bank of the West" by July 8, 2020. Respondent did not respond to this request, nor did Respondent ever provide the trust account records requested by Deputy Bar Counsel.

62. On July 16, 2020, Deputy Bar Counsel issued a Subpoena to the Bank of the West requesting account statements for Mathey Law Office's operating and trust account from April 1, 2019 – November 30, 2019.

63. On July 27, 2020, Respondent voluntarily withdrew her membership in the Wyoming State Bar. At the time Respondent withdrew her membership, she knew that the bank's production of Respondent's trust account statements was going to expose fraudulent activities on Respondent's part regarding her trust account.

15

64. With respect to the Johnson complaint, there is clear and convincing evidence that Respondent committed the following professional misconduct:

a. Respondent violated Rule 1.3 (diligence) by failing to file Johnson's lawsuit against Nick Tabler (Best Value Rentals v. Tabler) despite multiple requests from Johnson beginning in January 2019 and failing to file Johnson's lawsuit, Noble Investments v. City of Rock Springs, despite beginning to work on the case as early as June 7, 2017.

b. The same conduct also constitutes a violation of Rule 3.2, which provides, "A lawyer shall make reasonable efforts to expedite litigation consistent with the interests of the client."

c. Respondent violated Rule 1.4 (communication with client) by (1) failing to respond and/or failing to respond honestly to Johnson's requests for information pertaining to the Tabler lawsuit and Noble Investments lawsuit against the City of Rock Springs; (2) affirmatively misleading Johnson into believing that the Tabler lawsuit was filed and lying to him about the status of the lawsuit; (3) affirmatively misleading Johnson into believing that Respondent had filed the Noble Investments lawsuit and obtained a Default Judgment against the City of Rock Springs; (4) failing to provide documents allegedly filed in the Tabler and Noble Investments lawsuits to Johnson despite repeated requests; and (5) lying to Johnson and Co-Plaintiff about the status of their settlement funds by stating the settlement checks had been mailed when the check had not yet been issued.

d. Respondent violated Rule 8.1 (duty to cooperate with disciplinary investigation) by (1) failing to provide documents requested by the OBC and failing to

16

respond to requests altogether, and (2) knowingly and repeatedly making material misrepresentations to the OBC.

e. Respondent violated Rule 8.4(b) (commission of a criminal act) by fabricating a Default Judgment in the Noble Investments case and by pasting Judge James' signature and District Court file stamp onto the fabricated Default Judgment.

f. Respondent violated Rule 8.4(c) (dishonest conduct) by repeatedly lying to Johnson about the status of his cases, by informing Johnson and Co-Plaintiff that settlement checks had been issued when they had not, and by fabricating a Default Judgment.

g. Respondent violated Rule 8.4(d) (conduct prejudicial to the administration of justice) by blaming judges, court staff and the court system for delays in the Tabler and Noble Investments lawsuits when in fact the delay was caused by Respondent's failure to file the cases. Respondent further violated Rule 8.4(d) by falsifying a Default Judgment and pasting Judge James' signature and District Court file stamp onto the fake Default Judgment.

65. In committing the foregoing misconduct, Respondent violated duties owed to her clients (ABA Standard 4.4) and to the public (ABA Standard 5.1). Under Standard 5.1, disbarment is the presumptive sanction for Respondent's misconduct, as Respondent engaged, on several levels, in intentional conduct involving dishonesty, deceit and misrepresentation that seriously adversely reflects on Respondent's fitness to practice.

66. Respondent's neglect of her clients and her overtly dishonest acts caused actual harm to her clients.

67. The following aggravating factors are present: (1) dishonest motive; (2) a pattern of misconduct; (3) bad faith obstruction of the disciplinary proceeding; (4) submission of false

17

evidence, false statements and other deceptive practices during the disciplinary process; (5) refusal to acknowledge wrongful nature of conduct; and (6) substantial experience in the practice of law.

68. The following mitigating factor is present: absence of a prior disciplinary record.

69. In consideration of the foregoing factors and misconduct by Respondent, the appropriate sanction is disbarment.

70. If the Court adopts the Review Panel's recommendation and issues an Order of Public Censure in accordance herewith, the parties have agreed to the following press release:

The Wyoming Supreme Court issued an order of disbarment to Green River attorney Danielle M. Mathey. The disbarment stemmed from Mathey's conduct in representing several clients in matters in which Mathey lied to clients about the status of their cases, fabricated court documents and mishandled trust account funds belonging to the client as well as failing to respond to inquiries by the Wyoming State Bar's Office of Bar Counsel regarding her conduct. Mathey admitted that her conduct violated Rules of Professional Conduct regarding diligence, candor in communications with clients, safeguarding of client funds held in trust, commission of criminal acts, dishonest conduct, conduct prejudicial to the administration of justice and failure to cooperate with disciplinary investigations. In approving the stipulation of Mathey and Bar Counsel for disbarment as the appropriate sanction for Mathey's conduct, the Court ordered Mathey to pay administrative fees in the amount of $1,500.00 and costs of $100.00 to the Wyoming State Bar.

### Conclusions of law

71. The Bar retains jurisdiction over Mathey's pending disciplinary matters:

**Section 4. Withdrawal from membership.**
Any person having been admitted to the Wyoming State Bar who desires to withdraw therefrom shall submit a request to the Wyoming State Bar. The request shall be reviewed by the executive director, who shall then make a recommendation for action on the request to the Wyoming Supreme Court. The Wyoming Supreme Court may then enter such order as it deems appropriate. According to the terms of the order allowing withdrawal by the Wyoming Supreme Court, the person shall cease to be a member of the Wyoming State Bar and shall no longer be authorized to practice law in Wyoming. A member's withdrawal shall not stay or otherwise affect a pending disciplinary investigation or proceeding regarding that member. A member who withdraws may thereafter seek admission to the Wyoming State

18

Bar as provided in the Wyoming Rules and Procedures Governing Admission to the Practice of Law.

WY R BAR BYLAWS art. I.

72.  Rule 1.3, W.R.Prof.Cond., provides, "A lawyer shall act with reasonable diligence and promptness in representing a client.

73.  Rule 1.4, W.R.Prof.Cond., provides in pertinent part:

(a) A lawyer shall:
(1) promptly inform the client of any decision or circumstance with respect to which the client's informed consent, as defined in 1.0(f), is required by these Rules;
(2) reasonably consult with the client about the means by which the client's objectives are to be accomplished;
(3) keep the client reasonably informed about the status of the matter;
(4) promptly comply with reasonable requests for information; and
(5) consult with the client about any relevant limitation on the lawyer's conduct when the lawyer knows that the client expects assistance not permitted by the Rules of Professional Conduct or other law.

74.  Rule 3.2, W.R.Prof.Cond., provides, "A lawyer shall make reasonable efforts to expedite litigation consistent with the interests of the client."

75.  Rule 8.1, W.R.Prof.Cond., provides, "An applicant for admission to the bar, or a lawyer in connection with a bar admission application or in connection with a disciplinary matter, shall not: (a) knowingly make a false statement of material fact; or (b) fail to disclose a fact necessary to correct a misapprehension known by the person to have arisen in the matter, or knowingly fail to respond to a lawful demand for information from an admissions or disciplinary authority, except that this rule does not require disclosure of information otherwise protected by Rule 1.6."

76.  Rule 8.4, W.R.Prof.Cond., provides in pertinent part:

It is professional misconduct for a lawyer to:
***
(b) commit a criminal act that reflects adversely on the lawyer's honesty, trustworthiness or fitness as a lawyer in other respects;
(c) engage in conduct involving dishonesty, fraud, deceit or misrepresentation;

19

(d) engage in conduct that is prejudicial to the administration of justice ***

77. Rule 15(b)(3)(D), W.R.Disc.P., provides, "In imposing a sanction after a finding of misconduct by the respondent, the BPR shall consider the following factors, as enumerated in the ABA Standards for Imposing Lawyer Sanctions:"

1. Whether the lawyer has violated a duty owed to a client, to the public, to the legal system, or to the profession;
2. Whether the lawyer acted intentionally, knowingly, or negligently;
3. The amount of the actual or potential injury caused by the lawyer's misconduct; and
4. The existence of any aggravating or mitigating factors.

78. Standard 4.4, "Lack of Diligence," of the ABA Standards for Imposing Lawyer Sanctions sets forth the following guidelines:

Absent aggravating or mitigating circumstances, upon application of the factors set out in Standard 3.0, the following sanctions are generally appropriate in cases involving a failure to act with reasonable diligence and promptness in representing a client:

4.41 Disbarment is generally appropriate when:
   (a) a lawyer abandons the practice and causes serious or potentially serious injury to a client; or
   (b) a lawyer knowingly fails to perform services for a client and cause serious or potentially serious injury to a client; or
   (c) a lawyer engages in a pattern of neglect with respect to client matters and causes serious or potentially serious injury to a client.
4.42 Suspension is generally appropriate when:
   (a) a lawyer knowingly fails to perform services for a client and causes injury or potential injury to a client, or
   (b) a lawyer engages in a pattern of neglect with respect to client matters and causes injury or potential injury to a client.
4.43 Reprimand [i.e., "public censure" under Rule 9(a)(3) of the Rules of Disciplinary Procedure] is generally appropriate when a lawyer is negligent and does not act with reasonable diligence in representing a client, and causes injury or potential injury to a client.
4.44 Admonition [i.e., "private reprimand" under Rule 9(a)(4) of the Rules of Disciplinary Procedure] is generally appropriate when a lawyer is negligent and does not act with reasonable diligence in representing a client, and causes little or no actual or potential injury to a client.

79. ABA Standard 5.1, "Failure to Maintain Personal Integrity," provides:

Absent aggravating or mitigating circumstances, upon application of the factors set out in Standard 3.0, the following sanctions are generally appropriate in cases involving a

20

criminal act that reflects adversely on the lawyer's honesty, trustworthiness, or fitness as a lawyer in other respects, or in cases with conduct involving dishonesty, fraud, deceit, or misrepresentation:

5.11    Disbarment is generally appropriate when:

(a)    a lawyer engages in serious criminal conduct, a necessary element of which includes intentional interference with the administration of justice, false swearing, misrepresentation, fraud, extortion, misappropriation, or theft; or the sale, distribution or importation of controlled substances; or the intentional killing of another; or an attempt or conspiracy or solicitation of another to commit any of these offenses; or

(b)    a lawyer engages in any other intentional conduct involving dishonesty, fraud, deceit, or misrepresentation that seriously adversely reflects on the lawyer's fitness to practice.

5.12    Suspension is generally appropriate when a lawyer knowingly engages in criminal conduct which does not contain the elements listed in Standard 5.11 and that seriously adversely reflects on the lawyer's fitness to practice.

5.13    Reprimand [i.e., "public censure" under Rule 9(a)(3), W.R.Disc.P.] is generally appropriate when a lawyer knowingly engages in any other conduct that involves dishonesty, fraud, deceit or misrepresentation and that adversely reflects on the lawyer's fitness to practice law.

5.14    Admonition [i.e., "private reprimand" under Rule 9(a)(4), W.R.Disc.P.] is generally appropriate when a lawyer engages in any other conduct that reflects adversely on the lawyer's fitness to practice law.

80.    The Preface to the ABA Standards includes the following discussion regarding mental state:

The mental states used in this model are defined as follows. The most culpable mental state is that of intent, when the lawyer acts with the conscious objective or purpose to accomplish a particular result. The next most culpable mental state is that of knowledge, when the lawyer acts with conscious awareness of the nature or attendant circumstances of his or her conduct both without the conscious objective or purpose to accomplish a particular result. The least culpable mental state is negligence, when a lawyer fails to be aware of a substantial risk that circumstances exist or that a result will follow, which failure is a deviation of a care that a reasonable lawyer would exercise in the situation.

81.    Under the ABA Standards, "injury" is defined as "harm to a client, the public, the legal system, or the profession which results from a lawyer's misconduct. The level of injury can range from 'serious' injury to 'little or no' injury; a reference to 'injury' alone indicates any level of injury greater than 'little or no' injury." "Potential injury" is defined as "harm to a client, the

21

public, the legal system or the profession that is reasonably foreseeable at the time of the lawyer's misconduct, and which, but for some intervening factor or event, would probably have resulted from the lawyer's misconduct."

82.   ABA Standard 9.0, entitled "Aggravation and Mitigation," provides as follows:

9.1   *Generally*
After misconduct has been established, aggravating and mitigating circumstances may be considered in deciding what sanction to impose.

9.2   *Aggravation*

9.21   *Definition.* Aggravation or aggravating circumstances are any considerations or factors that may justify an increase in the degree of discipline to be imposed.

9.22   *Factors which may be considered in aggravation.* Aggravating factors include:
(a) prior disciplinary offenses;
(b) dishonest or selfish motive;
(c) a pattern of misconduct;
(d) multiple offenses;
(e) bad faith obstruction of the disciplinary proceeding by intentionally failing to comply with rules or orders of the disciplinary agency;
(f) submission of false evidence, false statements, or other deceptive practices during the disciplinary process;
(g) refusal to acknowledge wrongful nature of conduct;
(h) vulnerability of the victim;
(i) substantial experience in the practice of law;
(j) indifference in making restitution; and
(k) illegal conduct, including that involving the use of controlled substances.

9.3   *Mitigation.*

9.31   *Definition.* Mitigation or mitigating circumstances are any considerations or factors that may justify a reduction in the degree of discipline to be imposed.

9.32   *Factors which may be considered in mitigation.* Mitigating factors include:
(a) absence of a prior disciplinary record;
(b) absence of a dishonest or selfish motive;
(c) personal or emotional problems;
(d) timely good faith effort to make restitution or to rectify consequences of misconduct;
(e) full and free disclosure of disciplinary board or cooperative attitude toward proceedings;
(f) inexperience in the practice of law;
(g) character or reputation;
(h) physical disability;
(i) mental disability or chemical dependency including alcoholism or drug abuse when:
(1) there is medical evidence that the respondent is affected by a chemical dependency or mental disability;
(2) the chemical dependency or mental disability caused the misconduct;

22

(3) the respondent's recovery from the chemical dependency or mental disability is demonstrated by a meaningful and sustained period of successful rehabilitation; and

(4) the recovery arrested the misconduct and recurrence of that misconduct is unlikely.

(j) delay in disciplinary proceedings;

(k) imposition of other penalties or sanctions;

(l) remorse; and

(m) remoteness of prior offenses.

9.4    *Factors Which Are Neither Aggravating nor Mitigating.*

The following factors should not be considered as either aggravating nor mitigating:

(a) forced of compelled restitution;

(b) agreeing to the client's demand for certain improper behavior or result;

(c) withdrawal of complaint against the lawyer;

(d) resignation prior to completion of disciplinary proceedings;

(e) complainant's recommendation as to sanction; and

(f) failure if injured client to complain.

## Recommendation

In consideration of the foregoing findings of fact and conclusions of law, the Review Panel recommends as follows:

1.    That Respondent be disbarred for violations of Rules 1.3, 1.4, 3.2, 8.1, and 8.4(b), (c) and (d), W.R.Prof.Cond.

2.    That, upon issuance of the order of disbarment, the foregoing press release may be issued.

3.    That Respondent be required to pay an administrative fee of $1,500.00 and costs of $100.00 to the Wyoming State Bar within 10 days of such order.

Dated this __4__ day of February, 2021.

Debra J. Wendtland, Chair
Review Panel of the Board of Professional Responsibility
Wyoming State Bar

23